UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
EC, an infant under the age of 18 years by his
Mother and Natural Guardian, RC and RC
individually,

                                 Plaintiffs,                    **08-CV-3227 (TCP)**

                    -against-

                                                                **MEMORANDUM
                                                                AND ORDER**

THE COUNTY OF SUFFOLK, HUNTINGTON
UNION FREE SCHOOL DISTRICT,                                     **F I L E D**
HUNTINGTON INTERMEDIATE SCHOOL,                                IN CLERK'S OFFICE
MARY STOKKERS, DAVID ZIMMERMAN,                                U.S. DISTRICT COURT E.D.N.Y
THE SUFFOLK COUNTY POLICE DEPARTMENT
and POLICE OFFICER ANDREW FIORILLO,                            ★   MAR 3 0 2012   ★

                                 Defendants.                   LONG ISLAND OFFICE
-------------------------------------------------------------------X
PLATT, District Judge.

        Before the Court is Huntington Union Free School District's, Huntington

Intermediate School's, Mary Stokkers' and David Zimmerman's ("District defendants") motion

for summary judgment pursuant to Federal Rule of Civil Procedure 56 on plaintiffs' Amended

Complaint. Also before the Court is County of Suffolk's, Suffolk County Police Department's

and Police Officer Andrew Fiorillo's ("County defendants") motion for summary judgment on

said complaint. For the following reasons, the District defendants' motion is **GRANTED**. The

County defendants' motion is **GRANTED**. Plaintiffs' New York State law claims are dismissed

without prejudice to renew.

## I. BACKGROUND

**A.      The School District Defendants**

        On May 14, 2007, infant plaintiff EC was an eleven year-old sixth grade student in the

intermediate school in the Huntington Union Free School District ("District").[1] Dist. Def. 56.1 Stmt. ¶ 1. At all times relevant to this matter, defendant Mary Stokkers ("Stokkers") was principal of the District's intermediate school. *Id.* at ¶ 2. EC was classified as a student with a disability pursuant to the Individuals with Disabilities Education Act ("IDEA"). *Id.* at ¶ 3. EC has severe cognitive and developmental delays, speech and language impairments and a medical condition that requires a feeding tube. *Id.* at ¶ 4. Plaintiffs note that the foregoing is not a complete characterization of EC's illness, diagnosis and/or symptoms related to his medical, emotional, psychological and/or bio-physical condition. Plt. 56.1 Dist. Ctr. Stmt. ¶ 4. In addition to his feeding tube, EC has a mediport near his left shoulder. Dist. Def. 56.1 Stmt. ¶ 5. The school nurse's notes state that EC has "a permanent Medi-port inserted under his skin on the Left side" of his chest. Plt. 56.1 Dist. Ctr. Stmt. ¶ 5.

EC has a genetic metabolic condition called Very Long Chain Acyl-Coenzyme Dehydrogenese Deficiency ("VCLAD"). Dist. Def. 56.1 Stmt. ¶ 6. EC was assigned a one-on-one aide and was placed in a life-skills special education class taught by Sarah Valente ("Valente") who was his classroom teacher for the 2006-2007 school year. *Id.* at ¶ 7; Plt. 56.1 Dist. Ctr. Stmt. ¶ 7. The life-skills special education class was a class for students with severe developmental delays who functioned at a very low cognitive level. Dist. Def. 56.1 Stmt. ¶ 8. The class is composed of severely disabled students requiring basic skills training in terms of hygiene, hand washing, hair combing and teeth brushing. Valente testified that the class works on appropriate social skills such a taking turns and greeting others appropriately. Plt. 56.1 Dist. Ctr. Stmt. ¶ 8. During the 2006-2007 school year, the class had eight students, one classroom

---

1. The facts are taken from the parties' Local Rule 56.1 statements and from the record.

aide and five individual aides; one new student was added in April 2007 bringing the student total to nine. *Id.* at ¶ 9.

The individual aides assigned to EC's class were Deanne Boccard, Paula Ferraiolo, Sonia Frazier, Janet Sloan and Anna Melrose. Dist. Def. 56.1 Stmt. ¶ 10. Sonia Frazier ("Frazier") was EC's individual aide on May 14, 2007. *Id.* at ¶ 11. David Zimmerman ("Zimmerman") was the teacher's assistant assigned to EC's class. *Id.* at ¶ 12. As the teacher's assistant, Zimmerman was responsible for teaching designated lessons, accompanying students when they left the classroom and supporting the students' academic, social and behavioral progress. *Id.* at ¶ 13.

During the 2006-2007 school year, the District instituted a behavioral intervention plan ("BIP") for EC. *Id.* at ¶ 14. The purpose of a BIP is to target certain behaviors of a student that the District wishes to change, improve or reduce the frequency of and to provide positive reinforcement. *Id.* at ¶ 15. The purpose of a BIP is to achieve a positive outcome. *Id.* at ¶ 16. Thus, a BIP does not address whether a student should be restrained in response to various behaviors. *Id.* at ¶ 18. When necessary, however, a student might be restrained to keep the student safe. *Id.* at ¶ 17; Aff. Reape, Exh. B, Tr. Stokkers 76:3-7.

On May 14, 2007, the students in EC's class were taken outside to the playground area in order to participate in an adaptive physical education class. Dist. Def. 56.1 Stmt. ¶ 19. The playground area is located behind the school cafeteria. *Id.* at ¶ 20. The playground area is a large grassy field located near a road with a soccer field in the middle; swings, monkey bars and slides are on one side; areas for softball and kickball are on another side; and a basketball court is on another side. *Id.* at ¶ 21. The playground area is fenced, with an opening at the entrance to the parking lot. *Id.* at ¶ 22. Plaintiffs contend that there was conflicting testimony regarding the

-3-

description of the playground, whether or not it was fenced in, its location with respect to the incident and the location of the parking lot. They argue that the veracity of the testimony is for a jury to decide. Plt. 56.1 Dist. Ctr. Stmt. ¶¶ 21, 22. School nurse Elizabeth Scannello identified the incident playground as the "one behind the school near the, there's playground equipment . . . a swing set." Aff. Reape, Exh. E, Tr. Scannello 61:2-4. Valente described the incident playground as the "fifth and sixth grade playground," located on the "[r]ight side of the building if it's facing Lowndes Avenue." *Id.* at Exh. C, Tr. Valente 81:16-21. Valente testified that the playground is enclosed by a fence. *Id.* at 81:22-24. She also testified that the "playground faces the right side of the school, and there are parking lots on either side in the front and the back." *Id.* at 83:3-6.

Zimmerman and Frazier and the other aides accompanied the students to the adaptive physical education class. Dist. Def. 56.1 Stmt. ¶ 23; Aff. Reape, Exh. G, Tr. Triolo 15:20-16:22 & Exh. C, Tr. Valente 77:17-20. EC's adaptive physical education teacher, Eric Triolo, testified that EC began throwing rocks while he was on the playground; teacher's assistant Zimmerman and EC's aide Frazier also so testified. Dist. Def. 56.1 Stmt. ¶ 24. Frazier testified that first EC was throwing pebbles when she told him to put down the rocks so as not to injure anyone. *Id.* at ¶ 25. EC then threw some pebbles, almost hitting another child. *Id.* at ¶ 26. Triolo testified that he told EC to stop throwing rocks. *Id.* at ¶ 27. Plaintiffs deny the foregoing on the basis that the credibility of the testimony must be determined by a jury. Plt. 56.1 Dist. Ctr. Stmt. ¶¶ 24-26.

Physical education teacher Triolo testified that EC became agitated and defiant and he

brought EC's classmates back inside the building for their safety.[2]  Dist. Def. 56.1 Stmt. ¶¶ 28, 29. Stokkers testified that Triolo told her he was taking the class inside because EC was out of control.  *Id.* at ¶ 30.

EC remained outside with a number of other people including his aide Frazier.  *Id.* at ¶ 31.  EC picked up a large rock in the playground area.  *Id.* at ¶ 32.  Zimmerman testified that the rock was oval-shaped and approximately eight or nine inches long.  Aff. Reape, Exh. F, Tr. Zimmerman 49:4-9.  During his deposition, EC described the rock as approximately one foot long.  Aff. Reape, Exh. K, Tr. EC 45:14-20.  Plaintiffs dispute Zimmerman's testimony with regard to the size of the rock and contend it is an issue of fact for a jury.  Plt. 56.1 Dist. Ctr. Stmt. ¶ 32.  Plaintiffs further note that defendants are not in possession of the rock and, for this proposition, broadly cite to "Defendants' A-O" which encompasses hundreds of pages of testimony and plaintiffs' complaint.  ¶ 33.  General citations to reams of pages of testimony by different witnesses and plaintiffs' complaint, however, do not specifically controvert District defendants' statements as required by Local Rule 56(b).

Frazier testified that EC held the rock over his head.  *Id.* at ¶ 36; Aff. Reape, Exh. H, Tr. Frazier 30:4-15.  Zimmerman asked EC to put the rock down more than once.  Dist. Def. 56.1 Stmt. ¶ 34.  Plaintiffs point out that EC's Individualized Education Program ("IEP") states that he

---

2.  Plaintiffs dispute the characterization "for their safety" because "motive and intent are questions of credibility that a jury must determine."  Furthermore, plaintiffs contend that Valente's testimony was contradictory and the veracity of the statements must be determined by a jury.  Valente's testimony, as cited by plaintiffs, however, concerns a later period in time than Triolo's testimony and is not contradictory.  To the extent plaintiffs' or defendants' citations do not support the propositions for which they are offered, the Court shall disregard them.

In addition, plaintiffs' dispute much of the District defendants' Local Rule 56.1(a) statement by claiming the content is a "jury question."  Such rebuttals are argumentative and belong in opposition memoranda.  To properly dispute the contents of a 56.1(a) statement, plaintiffs must cite to factual evidence that controverts the proposition.  To the extent they do not, or cannot, the Court will also disregard those denials.  Where there is no support for defendants' statements, they will likewise be disregarded.

needs to be told verbal commands more than once. Plt. 56.1 Dist. Ctr. Stmt. ¶ 34. EC became

angry at Zimmerman and refused to put the rock down. Dist. Def. 56.1 Stmt. ¶ 35. Frazier

testified that Zimmerman took the rock from EC at which time EC became upset and began

yelling and running. *Id.* at ¶¶ 40, 43; Aff. Reape, Exh. H, Tr. Frazier 32:18-24. Plaintiffs

contend, on the other hand, that EC became angry after Zimmerman threw the rock down and EC

was restrained for what he thought was "hours." Plt. 56.1 Dist. Ctr. Stmt. ¶ 35.

　　Frazier testified that she was afraid EC would throw a rock at her. Dist. Def. 56.1 Stmt. ¶

37. Frazier stated that she heard the teachers calling her name and telling her to watch out

because EC appeared to be coming after her with his two hands up in a boxing stance as though

he was going to hit her. Valente then told Frazier to leave. Dist. Def. 56.1 Stmt. ¶ 45; Aff.

Reape, Exh. H, Tr. Frazier at 32:25-33:11.

　　In May 2007, as EC's mother testified, EC weighed approximately 156 pounds. Dist.

Def. 56.1 Stmt. ¶ 39. Zimmerman testified that he took the rock away from EC to prevent him

from injuring himself, that EC became very upset and began yelling, screaming and running. *Id.*

at ¶¶ 41-43. Zimmerman went back into the building, asked District staff to notify security and

then went back outside. *Id.* at ¶ 44.

　　School security guards Tom Burns ("Burns") and Gloria Wilson ("Wilson") were

assigned to the playground area during the lunch recess. *Id.* at ¶ 46. An aide in EC's class

called out to Wilson and approached her. *Id.* at ¶ 47. The aide asked Wilson for help and told

her that EC was throwing rocks and had elbowed her several times. *Id.* at ¶¶ 48, 49. Wilson,

who was not aware of EC's specific classification under the IDEA or the exact nature of his

physical limitations and who did not know whether EC had a behavior intervention plan,

approached EC. *Id.* at ¶¶ 50-52. Wilson was aware that EC "had problems" and learning disabilities and that he had a port on the "right" side of his chest.[3] *Id.* at ¶¶ 53-54; Plt. 56.1 Dist. Ctr. Stmt. ¶ 54.

Wilson had been called to assist District staff on several occasions when EC had become upset in the past. Dist. Def. 56.1 Stmt. ¶ 55. Sometime during the 2005-2006 school year, Wilson was called to the school nurse's office to assist when EC became agitated. *Id.* at ¶ 56. Plaintiffs admit to the incident but deny the statement as to the time frame, who was called and who was present. Plt. 56.1 Dist. Ctr. Stmt. ¶ 56. School psychologist Mary DiBenedetto ("DiBenedetto") and school nurse Scannello were also present during this incident.[4] Dist. Def. 56.1 Stmt. ¶ 57. EC had screamed that he wanted his medical port removed and also screamed, in effect: "Stop calling me stupid" and "Stop hitting me in the head." *Id.* at ¶¶ 58-59. DiBenedetto testified that nobody was hitting EC in the head or touching him at that time. *Id.* at ¶ 60. EC had run around the nurse's office and tried to strike out. *Id.* at ¶ 61. Not wanting EC to cause damage in the nurse's office, Wilson and Scannello tried to hold EC down in a chair. *Id.* at ¶¶ 62, 63. EC pushed Wilson, causing her to stumble and hurt her back. *Id.* at ¶ 64. DiBenedetto was concerned that EC would continue to be physically aggressive. *Id.* at ¶ 65. Sometime after EC's mother arrived that day, he calmed down. *Id.* at ¶ 66.

On the day in question, as Wilson approached EC in the playground area, there were "quite a few" students nearby and within a few minutes, the students were lined up and brought

_____

3. The school nurse's paperwork notes that the port is on the left side of EC's chest.

4. Plaintiffs dispute District defendants' statement on the ground that there is conflicting testimony. The District's statement, however, refers to the prior incident during the 2005-2006 school year. The testimony cited to by plaintiffs concerns the May 2007 incident.

inside. *Id.* at ¶¶ 67, 68. Wilson testified that she saw EC holding a rock over his head, that it appeared to her that he was about to throw the rock and that he was angry. *Id.* at ¶¶ 69-71. EC stated, in effect, that the rock was his. *Id.* at ¶ 72.

Wilson observed several people around EC. *Id.* at ¶ 73. EC did not appear to be speaking to anyone in particular. *Id.* at ¶ 74. Wilson tried to explain to EC that he could not throw rocks or bring rocks into the building. *Id.* at ¶ 75. Wilson testified that EC threw the rock toward the ground, but Zimmerman testified that he took the rock away from EC. *Id.* at ¶ 76; Aff. Reape, Exh. F, Tr. Zimmerman 45:24-46:2. Wilson also testified that after EC threw the rock down, he bent down to pick up other rocks at which point Wilson told him he could not throw rocks and EC became very agitated. Dist. Def. 56.1 Stmt. ¶¶ 77-79.

In effect, EC put his hands over his ears and said to Wilson, "I'm not listening to you." *Id.* at ¶ 80. Security guard Burns approached EC. *Id.* at ¶ 81. EC said, in effect, "Now it's three against one." *Id.* at ¶ 82. EC assumed a boxing stance and began running around, waving his fist at people and trying to hit those nearby. *Id.* at ¶¶ 83, 84. EC began running after an aide and tried to punch the aide. *Id.* at ¶¶ 85, 86. Wilson and Burns held EC's arms down at his sides to prevent him from hitting anyone. *Id.* at ¶ 87. Wilson kept EC's right arm down by holding EC's right wrist with both of her hands. *Id.* at ¶ 88. Burns held EC's left arm down at his side. *Id.* at ¶ 89. According to Zimmerman, EC "was kicking and screaming and basically going nuts, and one person was holding his legs and one person was holding his arms, I guess." Plt. 56.1 Dist. Ctr. Stmt. ¶ 89; Aff. Reape, Exh. F, Tr. Zimmerman 50:23-51:2. Plaintiff EC testified that "two custodians" were holding his arms for a couple of seconds. Aff. Reape, Exh. K, Tr. EC 17:22-18:5.

Wilson and Burns tried to calm EC down by talking to him. Dist. Def. 56.1 Stmt. ¶ 90. District defendants allege that EC screamed and tried to run, pulling Wilson and Burns along with him. *Id.* at ¶ 91. Plaintiffs dispute that EC was physically capable of dragging two adults with a combined weight of approximately 350 pounds across the playground considering that EC was unable to carry his backpack. Plt. 56.1 Dist. Ctr. Stmt. ¶ 91. Dr. Alfred Slonim, EC's doctor, testified to the following while being questioned by plaintiffs' attorney Danielle Seid:

> Q.      When you say that [EC] would have to lift heavy weights for the CPK levels to increase how much weight would you deem to be too heavy for [EC] to lift back in May of '07?
>
> A.      You are talking, I don't know how strong he is actually, but just going on other patients with rhabdomyolysis, maybe, a hundred pounds or something like that. In [EC's] case I have no idea what his sort of muscle strength is, but I would think that type of weight[] would be detrimental to him.

Aff. Seid, Exh. B, Tr. Slonim 135:10-21. Wilson weighed approximately 130 pounds and was 5' 5" tall. Dist. Def. 56.1 Stmt. ¶ 92. Burns was approximately 6' tall and weighed 210 pounds. *Id.* at ¶ 93.

According to the testimony, the incident on the playground transpired as follows. Wilson and Burns told EC they would let him go once he calmed down. *Id.* at ¶ 94. Wilson and Burns then let EC go because they figured that holding him was making him angrier, but when Wilson let go of EC, he continued to try to swing at bystanders. *Id.* at ¶¶ 95-96. Thus, Wilson and Burns held EC's arms again at which point EC dragged Wilson and Burns around. *Id.* at ¶¶ 97-98. He then pulled them approximately thirty to forty feet into an area with playground equipment, including a jungle gym, which Wilson and Burns did not want EC near because they thought it would be dangerous to EC and the bystanders. *Id.* at ¶¶ 99-101.

Wilson and Burns sat EC down in a sandy area by dropping down in a seated position while holding EC's arms. *Id.* at ¶ 102. As Burns and Wilson held EC with his arms crossed in front of him, he sat on the grass with his legs extended out in front of him near a sandbox with railroad ties. *Id.* at ¶¶ 103-05. Two or three other classes remained on the playground. *Id.* at ¶ 106. Wilson was pinned between EC and a wooden retaining wall. *Id.* at ¶ 107. Burns and Wilson attempted to drag EC away from the retaining wall, but were unsuccessful because EC was fighting, thrashing and trying to bite and head butt them. *Id.* at ¶¶ 108-09. Wilson tried to keep EC in a sitting position by pushing down on his right shoulder with her other hand while Burns held EC's left arm with both hands. *Id.* at ¶¶ 110-11. Wilson testified that she had to use both hands to keep EC in position because he was very strong. *Id.* at ¶ 112. She also testified that she tried to hold his arms away from his port. *Id.* at ¶ 113.

Burns and Wilson told EC to calm down and that things were okay. *Id.* at ¶ 114. Burns testified that EC thrashed and tried to bite both of them. *Id.* at ¶ 115. EC "head butted" Wilson three or four times in her chest, tried to hit his head on a nearby wooden retaining wall and tried to kick and bite Wilson. *Id.* at ¶¶ 116-18. Wilson backed up from EC and put her hand up at which time, EC did not bite Wilson, but "put his teeth into [her] arm." *Id.* at ¶¶ 119-20; Aff. Reape, Exh. J, Tr. Wilson 39:8-10.

Plaintiffs dispute portions of the school security guards' testimony on the ground that the security guards' reasons for their actions, such as calming EC down, holding his arms, sitting him down in the sand and holding him on the ground are credibility questions for a jury. Whether their actions were necessary to prevent EC from injuring himself or someone else is also a question of credibility according to plaintiffs. Plt. 56.1 Dist. Ctr. Stmt. ¶¶ 94, 95, 97, 100, 101,

102, 108, 113, 114, 116. Plaintiffs also dispute defendants' representations about EC's strength or his purported attempts to injure them as genuine issues of material fact. *Id.* at ¶¶ 96, 98, 99, 109, 112, 115, 117, 118. Finally, plaintiffs dispute defendants factual characterization of the events. *Id.* at ¶¶ 104, 105, 106, 107, 119, 120.

EC's teacher Valente testified that when she first saw him on the ground, she bent down in front of EC on the other side of the railroad tie and spoke to him in a calm voice, asking him to calm down, to take a deep breath and to count to ten. *Id.* at ¶¶ 121-22. EC screamed, "Let me go," made noise and struggled to get loose. *Id.* at ¶ 123. Burns and Wilson tried to discuss the situation with Valente who asked the security officers to cease talking about it in front of EC. *Id.* at ¶¶ 124-25.

EC did not calm down and Valente asked teacher's assistant Zimmerman to get EC some orange juice and to notify school nurse Scannello and school psychologist DiBenedetto. *Id.* at ¶¶ 126-28. Valente instructed the aides to bring EC's classmates back inside and instructed EC's individual aide Frazier to return to the building to help supervise the other children. *Id.* at ¶¶ 129-30. Zimmerman returned with orange juice within two minutes and Valente attempted to have him drink it through a straw. *Id.* at ¶¶ 131-32; Aff. Reape, Exh. C, Tr. Valente 94:6-11. EC resisted, became more upset and kept screaming and struggling. Dist. Def. 56.1 Stmt. ¶¶ 133-34. Valente estimated that approximately ten minutes passed from the time she arrived on the scene until Zimmerman returned with the orange juice. Aff. Reape, Exh. C, Tr. Valente 94:12-22.

While plaintiffs admit that the testimony is as stated above, they object to defendants' characterizations of the testimony. Where defendants state that EC resisted and became more upset after Valente tried to feed him orange juice from a straw, plaintiffs contend that EC was

more upset because he was being forcefully restrained, could not hold the container himself, was in physical pain and was confused over what was taking place. Plt. 56.1 Dist. Ctr. Stmt. ¶ 133.

School principal Stokkers arrived after EC had been pushed down to the ground by the security guards. *Id.* at ¶ 135; Dist. Def. 56.1 Stmt. ¶135. Valente testified that he continued to scream and struggle and Stokkers testified that he thrashed and tried to kick and bite those around him, leading her to characterize his behavior as out of control. Dist. Def. 56.1 Stmt. at ¶¶ 136-38. Zimmerman told Stokkers that EC was throwing rocks and that he had picked up a large rock and put his hand back as though he were going to throw the rock, which resulted in Zimmerman stopping him from throwing the rock. *Id.* at ¶¶ 139-42. Zimmerman then advised Stokkers that EC had become angry and had attacked Frazier. *Id.* at ¶ 143. Stokkers and Zimmerman testified that Stokkers tried to speak with EC to calm him down but he would not listen to her. *Id.* at ¶ 144.

Plaintiffs deny the District defendants' subjective characterization of EC's conduct and contend that same is an issue for a jury. They also contend that their testimony raises credibility questions, also to be determined by a jury. Plt. 56.1 Dist. Ctr. Stmt. ¶¶ 135, 137-38, 141, 143. Plaintiffs also dispute Zimmerman's characterization of the rock as a "large rock" as an issue to be decided by a jury. *Id.* at ¶ 140.

Stokkers called school nurse Scannello on a two-way radio to ask her to call EC's mother, RC, to take EC home immediately. *Id.* at ¶¶ 145-46. She advised Scannello that EC was aggressive, agitated and having the worst episode that Stokkers had ever seen. *Id.* at ¶¶ 147-48. She also knew that he needed to stay calm because of his medical condition. *Id.* at ¶ 149.

Scannello called RC and then went out to the playground area. *Id.* at ¶¶ 150-51. She

testified that EC was agitated, hostile, yelling and kicking while being restrained by Police Officer Andrew Fiorillo. Plt. 56.1 Dist. Ctr. Stmt. ¶ 152; Aff. Reape, Exh. E, Tr. Scannello 66:4-6. Scannello further testified that "putting someone's hands behind their back and holding them is pretty much a common technique used if you want to not injure somebody but still keep them under control" which she learned from watching "cop shows" and from her experience observing aggressive students in Nassau BOCES. Plt. 56.1 Dist. Ctr. Stmt. ¶ 153; Aff. Reape, Exh. E, Tr. Scannello 127:9-13; 128:16-17; 129:14-18. EC's teacher Valente testified that school psychologist DiBenedetto tried to calm EC by consoling him and telling him to take deep breaths. Dist. Def. 56.1 Stmt. ¶ 154-55.

DiBennedetto testified that she previously heard EC threaten to harm himself approximately fifteen or twenty times and had observed EC try to hurt himself by punching himself in the head approximately five or ten times. *Id.* at ¶¶ 156-57. District defendants contend that Scannello also tried to calm EC down, but Scannello testified that she did not speak to EC when she arrived at the playground. *Id.* at ¶ 158; Plt. Dist. Def. Ctr. Stmt. ¶ 158. Valente testified that EC continued to scream and that she observed the security guards holding him by the wrists for approximately twenty to thirty minutes. Dist. Def. 56.1 Stmt. ¶¶ 159-60.

Defendant Police Officer Andrew Fiorillo ("Fiorillo") hopped over the fence surrounding the playground area and arrived at the scene. *Id.* at ¶ 161. Fiorillo is employed by the Suffolk County Police Department as a police officer and he was assigned to the District school as well as another school as a school resource officer. *Id.* at ¶¶ 162-63. A school resource officer is a police officer who is assigned to act as a liaison between the police department and the staff and students at a school district. *Id.* at ¶ 164.

Fiorillo testified that when he arrived at the Huntington Intermediate School parking lot, he saw school security guards Wilson and Burns struggling to restrain EC on the ground in the playground area and that EC was seated in close proximity to a railroad tie. *Id.* at ¶¶ 165-66. Fiorillo went to assist Wilson and Burns and asked if the District staff needed help. *Id.* at ¶¶ 167-68. Burns and Wilson told Fiorillo that EC was out of control and was attempting to hurt himself or other people. *Id.* at ¶ 169.

Fiorillo testified that he saw EC kicking his feet, flailing his arms, yelling and trying to head butt and bite people. *Id.* at ¶ 170. Fiorillo and the security guards tried to calm EC down by speaking to him but he continued to try to head butt bystanders and tried to hit his head against a railroad tie. *Id.* at ¶ 172. Wilson told Fiorillo she could no longer control EC. *Id.* at ¶ 173. Wilson transferred EC's wrist to Burns' other hand and stepped away, complaining that her back was hurt. *Id.* at ¶ 174.

Burns held both of EC's wrists and had difficulty restraining EC by himself as EC tried to bite him and grab his finger which EC bent back, causing Burns to yell in pain. *Id.* at ¶¶ 175-77. Fiorillo restrained EC by himself while EC continued to scream, yell, kick his feet and butt others with his head. *Id.* at ¶¶ 178-79. Valente testified that Fiorillo tried to calm EC down. *Id.* at ¶ 180. In Fiorillo's opinion, EC was acting in a manner that was dangerous to EC and others. *Id.* at ¶ 181. Approximately, five to seven minutes after he arrived at the scene, Fiorillo told Stokkers that he could not control EC and would have to handcuff him. *Id.* at ¶ 182. While Stokkers told Fiorillo to do whatever he had to do to control EC and keep him safe, the undisputed testimony shows that Stokkers did not direct Fiorillo to handcuff EC. *Id.* at ¶¶ 183-84.

EC continued to struggle whereupon Fiorillo stated that he was going to put EC in handcuffs. *Id.* at ¶¶ 185-86. Fiorillo told EC to put his hands behind his back but did not act forcefully. *Id.* at ¶¶ 188-89. He handcuffed EC's hands behind EC's back and held EC by the shoulders in order to prevent EC from hitting his head on the railroad ties and injuring himself. *Id.* at ¶¶ 190-91. EC began screaming and crying, saying, in effect, "Take them off. Get them off of me." *Id.* at ¶¶ 192-93. EC screamed, cried and said his bones hurt while continuing to head butt, kick his feet and yell. *Id.* at ¶¶ 194-95.

School psychologist DiBenedetto testified that EC attempted to hit his head on the railroad ties. *Id.* at ¶ 196; Aff. Reape, Exh. L, Tr. DiBenedetto 101:18-102:9. DiBenedetto testified that Fiorillo was not holding EC at that point. Plt. Dist. Def. Ctr. Stmt. ¶ 197. Principal Stokkers testified that Fiorillo had to hold EC's shoulders to prevent him from banging his head on the railroad ties. Aff. Reape, Exh. B, Tr. Stokkers 197:3-5. Stokkers also testified that EC was unable to hit his head on the railroad ties because he was handcuffed. *Id.* at Exh. R, Tr. Stokkers 367:13-20.

Stokkers also testified that she attempted to calm EC down by talking to him, but that he was uncontrollable during the episode and that she asked Fiorillo to call an ambulance because she was concerned about EC's medical condition. Dist. Def. 56.1 Stmt. ¶¶ 198-201.

EC's mother, RC, arrived at the scene approximately five minutes after EC was handcuffed. *Id.* at ¶ 202. EC was still yelling and kicking his feet when his mother arrived and he screamed at her. *Id.* at ¶¶ 203-04. RC spoke to EC in Spanish and calmed him down. *Id.* at ¶¶ 205-06. When RC noticed that EC was handcuffed, she became upset and asked that the handcuffs be removed, which was immediately done by Fiorillo. *Id.* at ¶¶ 207-08. Plaintiffs

-15-

contend that RC believes that Fiorillo was trying to remove the handcuffs before she realized they were on EC so that RC would not find out that EC was handcuffed. Plt. Dist. Def. Ctr. Stmt. ¶ 208. The citation does not, however, support their proposition.

Valente testified that after EC's handcuffs were removed, he punched himself in the head and pinched his leg. Dist. Def. 56.1 Stmt. ¶ 209. RC took EC's hands and began walking towards her car. *Id.* at ¶ 210. An ambulance arrived while EC and RC were walking towards their car, but RC did not want EC to go to the hospital in an ambulance and RC decided she would take EC to the hospital herself. *Id.* at ¶¶ 211-12. The ambulance attendants checked EC's pulse. *Id.* at ¶ 213.

RC took EC to Huntington Hospital, then to EC's doctor's office where EC told his doctor that his arms hurt. *Id.* at ¶¶ 214-15. EC's doctor was concerned with EC's emotional reaction and he talked to EC and asked him to relax. *Id.* at ¶¶ 216-17. RC further testified that EC's doctor examined the results of the lab tests and told RC that EC could go home. *Id.* at ¶¶ 218-19. The doctor told RC to bring EC back in two days and did not do anything further. *Id.* at ¶¶ 220-21. Plaintiffs dispute the statement, taken from RC's deposition, on the grounds that "RC took EC to several doctors to follow up on EC's emotional well being and physical well being following this traumatic incident." Plt. Dist. Def. Ctr. Stmt. ¶ 221. Plaintiffs do not, however, cite to any evidence for this proposition and, consequently, their bare denial is disregarded as are any denials unsupported by specific admissible evidence.

RC also testified that EC's doctor recommended that EC return to school because he would recuperate sooner. Dist. Def. 56.1 Stmt. ¶ 222. EC missed several days of school after the incident because he did not want to go to school. *Id.* at ¶ 223. His mother testified that EC spent

short periods of time at school after the incident, but she also testified that he spent short periods of time at school before the incident. *Id.* at ¶¶ 224-25.

RC typically dropped EC off at school on her way to work and picked him up on her way home. *Id.* at ¶ 226. RC worked three hours per day at a school building located approximately ten minutes away. *Id.* at ¶ 227. According to RC's testimony, EC was not treated for any physical injuries after the incident. *Id.* at ¶ 228. His medical bills are covered by medical insurance. *Id.* at ¶ 229. After the incident, District staff and RC met to establish an intervention protocol if EC became as upset as he was during the May 14, 2007 incident. *Id.* at ¶ 230. RC and EC are Hispanic. *Id.* at ¶ 231. RC testified that she believes that school principal Stokkers dislikes Hispanics. *Id.* at ¶ 232. On one occasion during the school day, RC and the school psychologist had a conversation in Spanish. *Id.* at ¶ 233. As Stokkers approached RC and the school psychologist, Stokkers and the psychologist began to speak in English. *Id.* at ¶¶ 234-35. Stokkers, RC and the psychologist had a conversation and the psychologist translated Stokkers' words into Spanish for RC. *Id.* at ¶¶ 236-37. At one point, Stokkers told RC, in effect, that if RC wanted to speak Spanish in school, she should go somewhere else. *Id.* at ¶ 238. RC testified that "[t]he thing I remembered the most was that Mary Stokkers arrived at that moment, and told us if you want to speak Spanish go somewhere else." Aff. Reape, Exh. T, Tr. RC 344:22-25; Plt. Dist. Def. Ctr. Stmt. ¶ 239. The psychologist continued translating the conversation for RC. Dist. Def. 56.1 Stmt. ¶ 239. Stokkers did not stop the psychologist from translating for RC, nor did she prohibit RC from speaking Spanish in the school. *Id.* at ¶¶ 240-41.

On another occasion, Stokkers told RC that RC was not the owner of the school and she forbade RC from parking in the school's rear parking lot although RC had parked in the rear lot

for three years. *Id.* at ¶¶ 242-44. Stokkers told RC that she could not park in the rear parking lot because she spoke to the children and told RC to park a little further away. *Id.* at ¶¶ 245-46. RC wrote to Stokkers asking for an explanation but did not receive a reply to her letter. *Id.* at ¶¶ 247-48. Stokkers had discussions with RC in front of other people, rather than in Stokkers' office. *Id.* at ¶ 249. Stokkers does not acknowledge RC when RC greets her. *Id.* at ¶ 250. RC believes that Stokkers took these actions because RC is of Hispanic origin. *Id.* at ¶ 251. RC is unaware of any incidents where Stokkers took action against other individuals based on their being Hispanic. *Id.* at ¶ 252.[5]

## B.    The Suffolk County Defendants

The County of Suffolk, Suffolk County Police Department and Police Officer Andrew Fiorillo ("County defendants") point out that as of April 2, 2007, EC was five feet tall and weighed 158 pounds.[6] Cnty. Def. 56.1 Stmt. ¶ 2. On June 10, 2009, County defendants served upon plaintiffs County defendants' Request for Admissions. *Id.* at ¶ 3. On or about August 10, 2009, plaintiffs served their Supplemental Reply to County defendants' Requests for Admissions. *Id.* at ¶ 4. In their Supplemental Reply, plaintiffs admitted the following numbered requests: 4, 6,

---

5. Plaintiffs have submitted their own statement of facts containing 184 paragraphs as well as a statement of facts against the County defendants. These facts are incorporated to the extent they are relevant, non-repetitious and cite specifically to the record. Mere reference, for example, to an entire deposition is not "specific." *See Amnesty America v. Town of West Hartford*, 288 F.3d 467, 470-71 (2d Cir. 2002) ("[B]ecause nothing in the federal rules mandates that district courts conduct an exhaustive search of the entire record before ruling on a motion for summary judgment, district courts are entitled to order litigants to provide specific record citations."). *See also* EDNY/SDNY Local Rule 56.1(c) (requiring each numbered paragraph to be "specifically controverted" by the party opposing summary judgment). Naturally, any factual statements must cite to the record with specificity in the first instance.

6. The County defendants adopt and rely upon the facts alleged in the District defendants' Local Rule 56.1(a) statement for the purposes of this motion. Cnty. Def. 56.1 Stmt. ¶ 1. Plaintiffs adopt and rely upon their facts alleged in opposition to the District defendants 56.1(a) statement for the purposes of this motion. Plt. Cnty. Def. Ctr. 56.1 Stmt. ¶ 1.

7, 18, 20, 22, 25, 27 and 30. Accordingly, plaintiffs admitted the following facts:

    (a)    Officer Fiorillo did not punch EC on May 14, 2007.

    (b)    Officer Fiorillo did not kick EC on May 14, 2007.

    (c)    Officer Fiorello did not cause a fracture to EC on May 14, 2007.

    (d)    Officer FIORILLO did not use force against EC other than in the course of handcuffing and restraining him.

    (e)    EC was not on the premises of Huntington Hospital at any time on May 15, 2007.

    (f)    EC was not treated at Huntington Hospital at any time on May 15, 2007.

    (g)    EC was never charged with juvenile delinquency or any violation of the New York Penal Law on May 14, 2007.

    (h)    EC did not receive medical treatment on May 15, 2007 for a physical injury which was the immediate result of the application of handcuffs.

    (I)    EC did not receive medical treatment on May 15, 2007 for a physical injury which was the immediate result of physical contact with Fiorillo.

*Id.* at ¶ 5. Fiorillo testified that EC was not bent at the waist while he was handcuffed. *Id.* at ¶ 6.

EC pointed to the back of his neck and testified that the "custodian and the police" pushed his head down. Plt. Cnty. Def. Ctr. 56.1 Stmt. ¶ 6; Aff. Seid, Exh. A, Tr. EC 7:19-25. EC also testified to the following while being questioned by his attorney, Danielle Seid:

    Q.    [E], earlier you said that somebody pushed your neck down; do you remember saying that?

    A.    Yes. They pushed me down very hard.

    Q.    Where were they pushing you–show me on your body where they pushed you?

    A.    Right here.

    Q.    You're pointing to the back of your neck?

| A. | Yeah, they were like this. |
| Q. | Where was your head facing, was your head facing up or down? |
| A. | Down. |
| Q. | You were looking at the ground? |
| A. | I don't know. |
| Q. | Were you standing, or were you sitting when that happened? |
| A. | Down. |
| Q. | You were sitting down? |
| A. | Yes. |

*Id.* at 70:24-71:20.

Fiorillo also testified that he was unfamiliar with EC's medical condition when he arrived at the Huntington Intermediate School on May 14, 2007. Cnty. Def. 56.1 Stmt. ¶ 7. At the time of his arrival defendant Huntington Intermediate School on May 14, 2007, Fiorillo had never been given any documents concerning EC's medical condition. *Id.* at ¶ 8. On May 14, 2007, Officer Fiorillo did not know that EC had a mediport in his shoulder and no one had supplied him with information as to EC's medical history at or before his arrival at the school. *Id.* at ¶¶ 9-10. Nor had anyone supplied Fiorillo with a copy of EC's Behavioral Intervention Plan. *Id.* at ¶ 11.

After EC was handcuffed, Fiorillo called the local rescue service for an ambulance. *Id.* at ¶ 12. EC was not treated for any physical injury caused by the use of force against him on May 14, 2007. *Id.* at ¶ 13. While EC was handcuffed, he did not tell RC that he was in pain or that his hands hurt. *Id.* at ¶ 14. When Officer Fiorillo removed the handcuffs, EC picked up a stick

and began poking it into the ground; his mother told him to stop. *Id.* at ¶ 15.

County defendants contend that no custom or policy of defendant Suffolk County caused a violation of EC's constitutional rights and that plaintiffs cannot prove that a custom or policy caused a violation of EC's constitutional rights. *Id.* at ¶¶ 16-17. Plaintiffs dispute this statement on the grounds that Fiorillo testified that he works with school administrators on a daily basis, including Principal Stokkers. Plt. Cnty. Def. Ctr. 56.1 Stmt. ¶¶ 19-20. They also dispute the statement because Fiorillo testified that it was his duty to assist the kids in any way they might need help; that Fiorillo was not provided with any training specific to special needs children prior to May 14, 2007; that defendant Suffolk County Police Department provided no training pertaining to the New York State Guidelines for handling children with special needs; that Fiorillo testified that he was unaware of any specific guidelines by Huntington Union Free School District pertaining to his position as a school resource officer; and that Fiorillo was unaware of any guidelines restricting his interaction with a student while on school grounds. *Id.*

## C.    Plaintiffs' Amended Complaint

As to the County defendants, plaintiffs' first claim alleges that the County of Suffolk deprived EC of his civil rights in violation of 42 U.S.C. § 1983 by: unlawfully detaining him; subjecting him to discrimination as a result of his physical and mental disabilities in violation of the American with Disabilities Act, 42 U.S.C. § 12132; and a violation of EC's Fifth and Fourteenth Amendment rights, including his substantive due process and equal protection interests. Plaintiffs' first claim also alleges that County of Suffolk abused their governmental authority, falsely imprisoned and falsely arrested EC, used excessive force and unlawful corporal punishment as well as intentional and negligent infliction of severe emotional distress. DE 14 at

¶ 56.

Continuing on, the first claim also alleges that defendant County of Suffolk and its employees, agents and/or servants deprived EC of his civil rights in negligently hiring and supervising its employees and in improperly supervising and/or training defendant Officer Fiorillo. The amended complaint also alleges that the County improperly supervised and/or trained the aides and/or teachers and/or personnel responsible for EC and employed insufficiently trained and unqualified personnel for the purposes of attending to EC. They further allege the County created a hostile learning environment ; failed to provide for EC's safety while attending school by failing to take necessary steps, actions and precautions and by failing to remove Officer Fiorillo following the incident. *Id.* at ¶ 57.

As against defendant Huntington Union Free School District, the first claim alleges that, acting under color of state law, the district deprived EC of his civil rights by: unlawfully detaining EC; subjecting EC to discrimination based on his ethnicity and race and his physical and mental disabilities in violation of the American with Disabilities Act; violating EC's Fifth and Fourteenth Amendment rights; falsely imprisoning and using excessive force; and by the intentional and negligent infliction of emotional distress. *Id.* at ¶ 59.

The first claim also alleges that Huntington Union Free School District and its employees negligently hired, supervised and trained its employees and that the district utilized insufficiently trained and unqualified personnel. The claim further alleges that the District failed to remove officer Fiorillo following the incident which led to direct contact between EC and defendant Fiorillo, specifically during the last week of January 2008, thereby causing EC to attend school in fear of further corporal punishment. *Id.* at ¶ 60.

Still continuing, the first claim alleges that defendant Huntington Intermediate School's employees deprived EC of his civil rights by unlawfully detaining him and subjecting him to discrimination based on his ethnicity and race. The first claim also alleges that defendant violated the Americans with Disabilities Act by discriminating against EC based on his physical and mental disabilities. The first claim further states a substantive due process and equal protection claim against the Huntington Intermediate School and its employees as well as false imprisonment, use of excessive force, unlawful use of corporal punishment and intentional and negligent infliction of emotional distress claims. *Id.* at ¶ 62.

The first claim also contends that Huntington Intermediate School and its employees deprived EC of his civil rights by: negligently hiring and supervising its employees; improperly supervising and/or training its employees thereby creating a hostile learning environment; failing to take the necessary steps to protect EC; and failing to remove defendant Fiorillo. *Id.* at ¶ 63.

Furthermore, the first claim alleges that Stokkers and Zimmerman, in their capacities as employees of defendants County of Suffolk, Huntington Union Free School District and Huntington Intermediate School, deprived EC of his civil rights in violation of 42 U.S.C. § 1983 by: unlawfully detaining plaintiff, subjecting EC to discrimination based on his ethnicity and race; violating the American with Disabilities Act based on EC's mental and physical disabilities; violating EC's Fifth and Fourteenth Amendments including his substantive due process liberty interest and equal protection; falsely imprisoning EC; using excessive force against EC; and by using corporal punishment. Plaintiffs also claim that Stokkers and Zimmerman engaged in intentional and negligent infliction of severe emotional distress. *Id.* at ¶¶ 65, 68.

The amended complaint also alleges that Stokkers deprived EC of his civil rights by negligently hiring and supervising employees, in improperly supervising and training the aides and/or teachers or other personnel responsible for EC, improperly and carelessly leaving EC under he control and/or supervision of improperly trained and unqualified staff, creating a hostile learning environment and failing to remove defendant Fiorillo following the incident thereby causing EC to attend school in fear of further corporal punishment. *Id.* at ¶ 66.

The first claim also alleges that Zimmerman failed to properly supervise, monitor, watch, moderate and safeguard EC by leaving him improperly attended to creating a hostile learning environment, failing to adequately supervise students and provide for EC's safety while attending school and failing to take the necessary steps, actions and precautions to protect EC from injuries. *Id.* at ¶ 69.

Plaintiffs' first claim additionally alleges that the Suffolk County Police Department and its employees deprived EC of his civil rights in violation of 42 U.S.C. § 1983 by: unlawfully detaining him; subjecting him to discrimination as a result of his physical and mental disabilities in violation of the American with Disabilities Act, 42 U.S.C. § 12132; and a violation of EC's Fifth and Fourteenth Amendment rights, including his substantive due process and equal protection interests. Plaintiffs' first claim also alleges that the Suffolk County Police Department abused their governmental authority, falsely imprisoned and falsely arrested EC, used excessive force and unlawful corporal punishment as well as intentional and negligent infliction of severe emotional distress. *Id.* at ¶ 71.

At paragraph seventy-two of the amended complaint, it alleges that the Suffolk County Police Department and its employees deprived EC of his civil rights by: negligently hiring and

supervising its employees; improperly supervising and/or training its employees thereby creating a hostile learning environment; failing to take the necessary steps to protect EC; and failing to remove defendant Fiorillo.

Finally, the first claim alleges that defendant Police Officer Andrew Fiorillo was, at all relevant times, acting in his capacity as an employee or agent of the County of Suffolk, Huntington Union Free School District, Huntington Intermediate School and the Suffolk County Police Department. *Id.* at ¶¶ 73-76. Defendant Fiorillo, according to the amended complaint, violated EC's civil rights under 42 U.S.C. § 1983 by: unlawfully detaining him; subjecting him to discrimination as a result of his physical and mental disabilities in violation of the American with Disabilities Act, 42 U.S.C. § 12132; and a violation of EC's Fifth and Fourteenth Amendment rights, including his substantive due process and equal protection interests. The first claim also alleges that Officer Fiorillo abused his governmental authority, falsely imprisoned and falsely arrested EC, used excessive force and unlawful corporal punishment and intentionally and/or negligently inflicted severe emotional distress on EC. *Id.* at ¶ 77. According to the amended complaint, defendant Fiorillo also failed: to properly supervise EC, leaving him improperly attended and creating a hostile learning environment; to adequately supervise students and provide for EC's safety; to protect EC from injury; and used unreasonable and inappropriate force while detaining EC without probable cause. *Id.* at ¶ 78.

As to their second claim, plaintiffs allege that defendants intentionally inflicted severe emotional distress in the restraining and handcuffing of EC by acting in a manner that was outrageous, shocking, unwarranted, inappropriate and excessive. The claim also alleges that defendants had extensive knowledge as to EC's sensibilities and disabilities but that they acted in

a manner with utter disregard of the likely consequences. Additionally, according to the amended complaint, defendants were substantially certain that EC would suffer emotional distress of such severity that no reasonable person would be expected to endure. *Id.* at 81-115.

For a third claim, plaintiffs allege negligent infliction of severe emotional distress. They claim that defendants were responsible for acting as a reasonably prudent parent while dealing with the students attending Huntington Intermediate School. Plaintiffs further allege that defendants knew that students with disabilities have an increased risk of suffering mental and physical harm as a result of harsh treatment. According to the amended complaint, defendants breached their duty to EC by: negligently hiring and supervising their employees and agents; employing or utilizing insufficiently trained or unqualified personnel for purposes of watching and supervising EC; improperly or carelessly leaving EC under the control and supervision of such improperly trained and unqualified aides and/or teachers and/or police officers; failing to adequately supervise students and provide for EC's safety while attending school; and failing to remove defendant Police Officer Fiorillo following the incident at issue thereby causing EC to attend school in fear of further corporal punishment. *Id.* at ¶¶ 116-46.

Plaintiffs' fourth claim is for false arrest and false imprisonment. They allege that defendants County of Suffolk, Huntington Union Free School District, Huntington Intermediate School, Stokkers, Zimmerman, Suffolk County Police Department and Officer Fiorillo, or their employees or agents, confined EC within the schoolyard of Huntington Intermediate School through the use of handcuffs and excessive force. They also allege that EC was aware that he had been handcuffed, did not consent to such confinement and that the unlawful imprisonment and arrest was done willfully, maliciously, wantonly, unnecessarily and without reasonable

cause. *Id.* at ¶¶ 147-68.

Fifth, plaintiffs allege that defendants or their employees and/or agents grabbed, restrained and handcuffed EC without his consent thereby touching him in an offensive manner. As a direct result of defendants' affirmative acts, EC suffered severe and permanent physical and emotional injuries. According to plaintiffs' amended complaint, the assault and battery was done willfully, maliciously, wantonly and without reasonable cause.[7] *Id.* at ¶¶ 169-90.

## II. DISCUSSION

### A. Legal Standard for Summary Judgment

A motion for summary judgment may not be granted unless a court determines that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting FRCP 56(c)). "Summary judgment may be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Williams v. R.H. Donnelly Corp.*, 368 F.3d 123, 126 (2d Cir. 2004). The court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *Id.*; *Castle Rock Entertainment, Inc. v. Carol Publishing Group*, 150 F.3d 132, 137 (2d Cir. 1998). "A party opposing a properly brought motion for summary judgment bears the burden of going beyond the [specific] pleadings, and 'designating specific facts showing that there is a genuine issue for trial.' " *Amnesty America v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477

---

7. By Stipulation So Ordered on February 24, 2010, RC's claim for loss of EC's services, society and companionship was withdrawn. DE 51.

U.S. 317, 324 (1986)). If there is any evidence in the record from which a reasonable inference may be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

There is a "genuine" issue of fact only if the "evidence [presented] is such that a reasonable jury could return a verdict for the nonmoving party." *Giodano v. City of New York*, 274 F.3d 740, 746-47 (2d Cir. 2001). Plaintiff's evidence may not amount to a mischaracterization of facts because "attempts to twist the record do not create a genuine issue of material fact for a jury." *Kim v. Son*, No. 05 Civ. 1262, 2007 WL 1989473, at *6 (E.D.N.Y. July 9, 2007). Therefore, "where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001). Also, "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996). Finally, Federal Rule of Civil Procedure 56(c) mandates that all facts under consideration in a motion for summary judgment be directly supported by proof in admissible form.

**B.      District Defendants' Motion for Summary Judgment**

   **1.      Plaintiffs' 42 U.S.C. § 1983 Claims**

Pursuant to 42 U.S.C. § 1983:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

"The text of the statute purports to create a damages remedy against every state official for the

-28-

violation of any person's federal constitutional or statutory rights." *Kalina v. Fletcher*, 522 U.S. 118, 123 (1997) (citing 42 U.S.C. § 1983). Section 1983 "provides a mechanism for enforcing individual rights "secured" elsewhere, *i.e.*, rights independently "secured by the Constitution and laws" of the United States." *Gonzaga University v. Doe*, 536 U.S. 273, 285 (2002). " '[O]ne cannot go into court and claim a 'violation of § 1983' for § 1983 by itself does not protect anyone against anything.' " *Id.* (quoting *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979)). *See Chapman*, 441 U.S. at 618 ("Standing alone, § 1983 clearly provides no protection for civil rights since . . . §1983 does not provide any substantive rights at all.").

Section 1983 was created to "deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Sybalski v. Independent Group Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (citing *Carey v. Piphus*, 435 U.S. 247, 254-57 (1978)). "Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes 'state action.' " *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 941 F.2d 1292, 1295-96 (2d Cir. 1991) (citing *Blum v. Yaretsky*, 457 U.S. 991, 1003 (1982)). *See Sybalski*, 546 F.3d at 257 (holding that plaintiffs claiming violations of their constitutional rights pursuant to § 1983 are required to show state action).

Accordingly, "[b]y the plain terms of § 1983, two-and only two-allegations are required in order to state a cause of action under that statute. First, the plaintiff must allege that some person has deprived him of a federal right. Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law." *Gomez v. Toledo*, 446 U.S. 635, 640

(1980) (citing *Monroe v. Pape*, 365 U.S. 167, 171 (1961)).

Given the status of the District defendants as employees of a public school and of the County defendants as employees of Suffolk County as well as the status of the municipality, all defendants are state actors for the purposes of § 1983.

### a. Plaintiffs' Unlawful Seizure Claim

In pertinent part, the Fourth Amendment of the United States Constitution provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The Fourth Amendment prohibition on unreasonable searches and seizures applies to public school students. *See New Jersey v. T.L.O.*, 469 U.S. 325, 333 (1985) ("In determining whether the search at issue in this case violated the Fourth Amendment, we are faced initially with the question whether that Amendment's prohibition on unreasonable searches and seizures applies to searches conducted by public school officials. We hold that it does.").

Although *New Jersey v. T.L.O.* did not address whether the Fourth Amendment applies to the seizure of a public school student, courts apply the framework applicable to student searches established in *T.L.O.* to determine whether the seizure of a student is reasonable. *Mislin v. City of Tonawanda School Dist.*, No. 02 Civ. 273S, 2007 WL 952048, at *8 (W.D.N.Y. Mar. 29, 2007). *See Shuman ex rel. Shertzer v. Penn Manor School Dist.*, 422 F.3d 141, 148 (3d Cir. 2005) ("seizures in the public school context [are] to be governed by the reasonableness standard, giving special consideration to the goals and responsibilities of our public schools"); *Doe ex rel. Doe v. Hawaii Dept. of Educ.*, 334 F.3d 906, 909 (9th Cir. 2003) (seizure of a student "violates the Fourth Amendment if it is objectively unreasonable under the circumstances"); *Hassan v.*

*Lubbock Indep. School Dist.*, 55 F.3d 1075, 1079 (5th Cir. 1995) (holding that the "reasonableness of seizures must be determined in light of all of the circumstances, with particular attention being paid to whether the seizure was justified at its inception and reasonable in scope"); *Wallace by Wallace v. Batavia School Dist. 101*, 68 F.3d 1010, 1012 (7th Cir. 1995) ("Although *T.L.O.* dealt only with searches, several circuit courts have relied upon it to find that seizures of students by teachers also come within the ambit of the Fourth Amendment.").

The reasonableness of the school's actions must be examined "in light of the special relationship between teachers and students." *Wallace*, 68 F.3d at 1012 (citing *Hassan v. Lubbock Indep. Sch. Dist.*, 55 F.3d 1075, 1079 (5th Cir. 1995)). "Thus, while school officials are subject to the limitations of the fourth amendment, the reasonableness of seizures must be determined in light of all of the circumstances, with particular attention being paid to whether the seizure was justified at its inception and reasonable in scope." *Hassan*, 55 F.3d at 1079 (citing *Edwards ex rel. Edwards v. Rees*, 883 F.2d 882, 884 (10th Cir. 1989)) (holding that the legality of a student search depends on its reasonableness in light of the circumstances). The Supreme Court has stressed that the search must be reasonably related to its purpose, and must not be "excessively intrusive in light of the age and sex of the student and the nature of the infraction." *T.L.O.*, 469 U.S. at 342. There can be no Fourth Amendment violation where the seizure of a student is "reasonable under the circumstances then existing and apparent." *Mislin*, 2007 WL 952048, at *9.

District defendants argue that EC's seizure by its security guards was justified at its inception because he put himself, other students and staff at risk by picking up a rock and threatening to strike district staff, becoming angry, yelling, screaming and acting, according to the staff, "out of control." Dist. Def. Mem. in Supp. at p. 7. They also argue that the restraint was

reasonable in scope because EC was restrained after he began running around the play area uncontrollably and after he threatened other persons in the playground area with rocks and his fists. Consequently, defendants argue, it was reasonable for district staff to immobilize his arms and seat him on the ground.

Plaintiffs oppose defendants' motion for summary judgment and argue that the seizure was not justified at its inception because of uncontested testimony that EC did not have a rock in his possession, that he did not throw any rocks, that there were no students in the surrounding area and that his known disabilities required the implementation of his behavioral intervention and individual education plans. They further argue that EC was not out of control at the time he was seized and that even if a reasonable jury concluded that the seizure was justifiable, it would also conclude that the breadth of the seizure was unreasonable given EC's medical condition.

"A student is considered "seized" within the meaning of the Fourth Amendment if a reasonable person under like circumstances would not feel free to leave." *Mislin*, 2007 WL 952048, at *9 (citing *Gorthy v. Clovis Unified School Dist.*, No. 05 Civ. 1052, 2006 WL 236939, at *3 (E.D. Cal. Jan. 31, 2006)). *See Hawaii Dep't of Educ.*, 334 F.3d at 909 ("[A] seizure [in the constitutional sense] occurs when there is a restraint on liberty to the degree that a reasonable person would not feel free to leave."). Here, there is no question that EC was seized by the school security guards when they each held EC's arms down by his sides and when they forced EC to drop down into a seated position while holding him.

With respect to whether the seizure was justified at its inception and reasonable in scope, the record reflects the following: (a) EC began throwing pebbles, then rocks, while on the playground, which his aide told him to put down; (b) when told by his physical education teacher

-32-

to stop throwing the rocks, EC became agitated and defiant; (c) teacher's assistant Zimmerman took the rock from EC, at which time he became upset and began yelling and running; (d) school security guard Wilson testified that when she told EC he could not throw rocks, he became very agitated; (e) when security guard Burns approached EC, he assumed a boxing stance and began running around in an attempt to make physical contact; (f) Wilson held EC's right arm down at his side by holding his right wrist with both of her hands while Burns held EC's left arm down; (g) EC screamed and tried to run, pulling the guards along with him; (h) when Wilson and Burns let go of EC, he tried to swing at bystanders so they again held his arms; (I) the guards sat EC down in a sandy area by dropping down in a seated position while holding him; (j) EC continued thrashing around as testified to by newcomers to the scene, Principal Stokkers and EC's teacher, Valente; and (k) EC tried to bang his head and continued thrashing when defendant Officer Fiorillo arrived and relieved Wilson, then Burns.

Plaintiffs argue that the testimony recounting the witnesses' observations is "contested" or "a question of fact for the jury" or a "credibility question." Multiple witnesses, however, gave consistently similar accounts of their observations with regard to the events leading up to the seizure and would be held to such testimony during a trial. Plaintiffs have given no valid reason to doubt the witnesses' credibility or motivations. Nor have they offered contrary testimony or other evidence as to what took place on the playground. Mere unsubstantiated denials do not create genuine issues of material fact foreclosing summary judgment.

Furthermore, it is irrelevant that District defendants do not possess the actual rock. Uncontested and independent testimony by multiple witnesses concerning the events leading up to the seizure, including EC's aide Frazier, teacher's assistant Zimmerman, physical education

teacher Triolo and school security guard Wilson, establishes that EC was in possession of a rock. Zimmerman testified that the rock he took away from EC was approximately eight or nine inches long. EC himself testified that it was approximately one foot long. Thus, a reasonable juror would have to conclude that EC was in possession of a relatively sizeable rock. The removal of the rock from EC's hands by Zimmerman led EC to become out of control leading to the seizure at issue.

Nor is there a question of fact raised by Wilson's testimony that she saw EC throw the rock down while Zimmerman testified that he took the rock from EC because the record shows that both testified that after EC either threw down the rock or had it taken away, he became extremely agitated and a danger to himself and other bystanders, i.e., conduct which resulted in the actual seizure.

The record also establishes that the District defendants used only the force necessary to restrain EC by holding his arms down and bringing him to a sitting position on the ground. Thinking that their continued restraint was upsetting EC, the school guards let him go, but had to re-restrain him when EC tried to strike the bystanders. Once Officer Fiorillo arrived, he took over.

With respect to EC's medical condition, minutes from a telephone conference between the school, his parents and his doctor indicate that Dr. Slonim, when asked what should be done with EC when he becomes highly agitated, responded, "[EC] needs to have his behavior modified." Aff. Seid, Exh. D at p. 1044. During that meeting, RC noted that at one time, EC had been "running and running" and had to be hospitalized. *Id.* at p. 1045. Thus, the school security guards, whether they knew it or not, were actually preventing EC from running around the

playground and causing harm to himself.

Courts have recognized that with regard to searches and seizures, "[i]mmediate effective action is sometimes needed to deal with the frequent occurrence of events" which may happen in the school environment. *Wallace*, 68 F.3d at 1012 (citing *T.L.O.*, 469 U.S. at 339). Given that recognition as well as the undisputed record in this case, the seizure of EC by the District's security guards was justified at its inception and reasonable in scope given his age, sex, nature of the prohibited activity and the possibility of danger to himself or others. Thus, it was reasonable under the circumstances then existing and apparent. District defendants' motion for summary judgment on plaintiffs' 42 U.S.C. § 1983 Fourth Amendment seizure claim is hereby granted and the claim is dismissed as against them.

### b.    Plaintiffs' False Imprisonment Claim

"A plaintiff may bring an action for false arrest under state tort law or pursuant to 42 U.S.C. § 1983 based on unreasonable seizure in violation of the Fourth Amendment." *Kilburn v. Village of Saranac Lake*, No. 08 Civ. 0367, 2010 WL 1235576, at *3 (N.D.N.Y. Mar. 31, 2010). "In New York, the tort of false arrest is synonymous with that of false imprisonment." *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991) (citing *Jacques v. Sears, Roebuck & Co.*, 285 N.E.2d 871, 877 (N.Y. 1972)). "The elements of the state and federal claims are substantially the same." *Kilburn*, 2010 WL 1235576, at *3.

To prove the elements of false arrest under New York law, plaintiff must show: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994).

-35-

Turning to plaintiffs' false imprisonment claim, District defendants intended to confine EC as demonstrated by Wilson's and Burns' testimony that they held EC's arms down and that they sat him down in a sand area in a seated position by holding EC. His teacher Valente testified that EC screamed "let me go" while making noises and struggling to get loose which establishes that EC was conscious of the confinement to which he did not consent.

Having already held, however, that the seizure of EC was justified in its inception and reasonable in scope, the natural conclusion is that the continued restraint of EC by school district personnel was likewise justified. Had Burns and Wilson let go of EC, he could have injured himself, another student or school personnel, a decidedly unacceptable alternative. In fact, the record shows that Burns and Wilson did release EC for a few moments, but that he had to be re-restrained when he continued to act out. Clearly, then, failure to continue to restrain EC would have actually resulted in a breach of the District's duties to him, other students and school personnel.

Plaintiffs argue that under the facts of this case, District defendants participated in the arrest and imprisonment of EC from the inception of the seizure by school staff until EC was released to his mother's custody. As District defendants point out, in the context of a false arrest claim, "liability will not attach[] to a defendant who 'merely seeks police assistance or furnishes information to law enforcement authorities who are then free to exercise their own judgment as to whether an arrest should be made.' " *Camac v. Long Beach City School Dist.*, No. 09 Civ. 5309, 2011 WL 3030345, at * 8 (E.D.N.Y. July 22, 2011) (quoting *Paul v. Bank of Am. Corp.*, No. 09 Civ. 1932, 2011 WL 684083, at *6 (E.D.N.Y. Feb. 14, 2011)). *See King v. Crossland Sav. Bank*, 111 F.3d 251, 257 (2d Cir. 1997) ("To hold a defendant liable as one who affirmatively instigated

or procured an arrest, a plaintiff must show that the defendant or its employees did more than merely provide information to the police.").

Liability will attach, however, " 'if, with the intent to have the plaintiff arrested, [a defendant] makes false statements to the police and instigates an arrest.' " *Camac*, 2011 WL 3030345, at * 8 (quoting *Paul,* 2011 WL 684083, at *6). There is no evidence in this record, nor any contention, that District defendants gave Officer Fiorillo any false information to instigate the handcuffing of EC by Fiorillo.

Accordingly, for the foregoing reasons, District defendants' motion for summary judgment on plaintiffs' false imprisonment claim is granted and the claim is dismissed as against them.

### c. *Equal Protection Claim*

The Fourteenth Amendment provides, in pertinent part:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. Amend. XIV, § 1.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) (quoting *Phlyer v. Doe*, 457 U.S. 202, 216 (1982)). In light of the Clause's purpose to " 'secure every person within the State's jurisdiction

against intentional or arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents,' " *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (quoting *Sioux City Bridge Co. v. Dakota* County, 260 U.S. 441, 445 (1923)), the Supreme Court has recognized that "successful equal protection claims [may be] brought by a 'class of one.' " *Id.*

To state an equal protection claim for a class of one, a plaintiff must allege that he or she has "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* (citing cases). The Second Circuit Court of Appeals has held that "in order to succeed on a "class of one" claim, the similarity between plaintiffs and the persons with whom they compare themselves must be extremely high." *Neilson v. D'Angelis*, 409 F.3d 100,104 (2d Cir. 2005), *rev'd on other grounds, Appel v. Spiridon*, 531 F.3d 138, 141 (2d Cir. 2008).

Plaintiffs contend that a reasonable jury could determine that EC was intentionally treated differently from the eight other students in his life skills class because no other special education student with multiple disabilities was ever handcuffed while Stokkers was principal of the Huntington Intermediate School. Plaintiffs further argue that "[a]rguably, EC was purposefully singled out by District Defendants considering Defendant Stokkers dislike of EC's mother because she was of Puerto Rican [descent]." Mem. in Opp. at p. 7.

What plaintiffs fail to allege, however, is the existence of any other student who is similarly situated to EC, i.e., has the same or highly similar disabilities who was treated more favorably than EC, but who was non-Hispanic. Furthermore, to withstand summary judgment, plaintiffs would also have to establish that the equally disabled comparator student became

-38-

belligerent in the school environment, but was not seized and restrained because of his race. This case being at the summary judgment stage and plaintiffs failing to have established such a comparison, District defendants' motion for summary judgment on plaintiffs' Equal Protection claim is hereby granted and the claim against the District Defendants is dismissed.

### d.    Substantive Due Process Claim

To prevail on a substantive due process claim, a plaintiff must prove that the conduct at issue was so extreme or egregious that it is fairly viewed as so " 'brutal' and 'offensive to human dignity' " that it shocks the conscience. *Yap v. Oceanside Union Free School Dist.*, 303 F. Supp. 2d 284, 296 (E.D.N.Y. 2004) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 n.6 (2d Cir. 1973)). *See Smith ex rel. Smith v. Half Hollow Hills Cent. School Dist.*, 298 F.3d 168, 173 (2d Cir. 2002) ("The protections of substantive due process are available only against egregious conduct which goes beyond merely " 'offend[ing] some fastidious squeamishness or private sentimentalism' " and can fairly be viewed as so " 'brutal' and 'offensive to human dignity' " as to shock the conscience.") (quoting *Johnson*, 481 F.2d at 1033 n.6). Thus, substantive due process "protects individuals against government action that is arbitrary, conscience shocking, or oppressive in a constitutional sense, but not against government action that is 'incorrect or ill-advised.' " *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994) (internal citations omitted).

"The Supreme Court has stated that not all constitutional claims relating to physically abusive conduct arise under either the Fourth or Eighth Amendments, but 'if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.' " *Bisignano v. Harrison Central School Dist.*, 113 F. Supp. 2d

-39-

591, 598 (S.D.N.Y. 2000) (quoting *United States v. Lanier*, 520 U.S. 259, 272 (1997)). This is in keeping with the tenet that where "a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.' " *Id.* (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994)).

This is not to say that seizure claims are never analyzed under the Due Process Clause. Where a court is "not concerned with the initial decision to detain an accused and the curtailment of liberty that such a decision necessarily entails," *Bell v. Wolfish*, 441 U.S. 520, 533-34 (1979), "but rather with the conditions of ongoing custody following such curtailment of liberty," substantive due process may be implicated. *Riley v. Dorton*, 115 F.3d 1159, 1163 (4th Cir. 1997), *abrog'd on other grounds, Wilkins v. Gaddy*, 130 S. Ct. 1175 (2010).

In *Kurilla v. Callahan*, 68 F. Supp. 2d 556, 557 (M.D. Pa. 1999), the court considered whether a teacher's use of momentary force in angrily grabbing a student, resulting in bruising, should be analyzed under the Fourth Amendment's standard of reasonableness or under the Fourteenth Amendment's Due Process "shocks the conscience" standard. It held that "the momentary use of physical force by a teacher in reaction to a disruptive or unruly student does not effect a "seizure" of the student under the Fourth Amendment" and, therefore, the shock the conscience due process standard was applicable to the facts of that case. *Id.* at 563. *See also Metzger ex rel. Metzger v. Osbeck*, 841 F.2d 518, 520 (3d Cir. 1988) ("A decision to discipline a student, if accomplished through excessive force and appreciable physical pain, may constitute an invasion of the child's Fifth Amendment liberty interest in his personal security and a violation of substantive due process prohibited by the Fourteenth Amendment.").

The gravamen of plaintiffs' amended complaint is that District defendants seized and falsely imprisoned EC. There is no credible allegation that the school security guards, or that any of the named District defendants, seized and restrained EC for the purpose of disciplining him. Rather, as has already been held herein, the District employees' seizure of EC was justified at inception and reasonable in scope under the circumstances. Consequently, their constitutional claim is "covered" by the Fourth Amendment and not the Fourteenth Amendment's Due Process clause.[8] Accordingly, District defendants' motion for summary judgment on plaintiffs' substantive due process claim is granted and the claim against them is dismissed.

### e. Excessive Force and Corporal Punishment Claims

The Second Circuit Court of Appeals has held that there is a "constitutional 'right to be free from the use of excessive force' in the 'non-seizure, non-prisoner context.' " *Johnson v. Newburgh Enlarged School Dist.*, 239 F.3d 246, 251 (2d Cir. 2001) (quoting *Rodriguez v. Phillips*, 66 F.3d 470, 476 (2d Cir. 1995)). "Factors to be considered in excessive force claims '[i]n determining whether the constitutional line has been crossed' include 'the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' " *Id.* at 251-52 (quoting *Metzger*, 841 F.2d at 520).

As set forth above, the extent of physical contact between the District's employees and EC

---

8. Plaintiffs' amended complaint also alleges that District defendants violated 42 U.S.C. § 1983 by abusing their governmental authority. As defendants properly point out, this claim also implicates the Fourteenth Amendment's Due Process Clause. For the reasons discussed in this section, defendants' motion for summary judgment on plaintiffs' governmental authority claim is granted and the claim is dismissed.

was reasonable. Beyond preventing EC from injuring himself or someone else, defendants did not apply anything approaching excessive force in their handling of EC. Moreover, there is no evidence on this record which demonstrates that the school guards' seizure and restraint of EC was malicious, sadistic or undertaken with the purpose of causing harm. Conversely, in *Johnson v. Newburgh Enlarged School District*, the court found that a student's right to be free from excessive force was implicated when the student's physical education teacher grabbed him by the throat, lifted him off the ground by his neck, dragged across the gym floor, slammed the back of his head against the bleachers numerous times, rammed his head into a metal fuse box and punched the student in the face. 239 F.3d at 249, 251.

With respect to excessive force claims brought pursuant to the Fourteenth Amendment by those not seized or not in custody, the "applicable test under the Due Process Clause is whether the defendant's conduct "shocks the conscience." *Kurilla*, 68 F. Supp. 2d at 560-61 (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998)). This Court has already held, however, that the constitutionality of the seizure and restraint of EC is to be analyzed under the Fourth Amendment

Plaintiffs additionally contend that District defendants used unlawful corporal punishment in dealing with EC. In determining whether corporal punishment is excessive, a court applies the same substantive due process inquiry, i.e., " 'whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a careless or unwise exercise of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.' " *Bisignano v. Harrison Central School Dist.*, 113 F. Supp. 2d 591, 600 (S.D.N.Y. 2000) (quoting *Hall v. Tawny*, 621 F.2d 607, 613 (4th Cir. 1980)).

Similar to plaintiffs' excessive force claim, this claim falls outside of the pertinent constitutional analysis.

For the foregoing reasons, District defendants' motion for summary judgment on plaintiffs' excessive force and corporal punishments claims is hereby granted and the claims are dismissed as to the District defendants.

### f.    *The School District's Liability*

Local municipal agencies may be sued when execution of a municipality's policy or custom "inflicts the injury that the government as an entity is responsible [for] under § 1983." *Monell v. Dep't of Social Serve. of City of New York*, 436 U.S. 658, 693 (1978). "Demonstrating that the municipality itself caused or is implicated in the constitutional violation is the touchstone of establishing that a municipality can be held liable for unconstitutional actions taken by municipal employees." *Amnesty America*, 361 F.3d at 125. *See Richardson v. Good*, 347 F.3d 431, 435 (2d Cir. 2003) ("To establish the liability of a supervisory official under § 1983, a plaintiff must show the defendant's personal involvement in the alleged constitutional violations."); *Green v. Bauvi*, 46 F.3d 189, 194 (2d Cir. 1995) ("In order to establish a § 1983 claim for the deprivation of a protected liberty or property interest without due process, a plaintiff must also show that the defendants were personally involved in the unconstitutional conduct. There is no *respondeat superior* liability in § 1983 cases.") (citing *Monell*, 436 U.S. at 691).

"[A] municipality will be liable for inadequate training or supervision of its employees "only where the failure to train amounts to deliberate indifference to the rights" of those with whom municipal employees will come into contact." *Bisignano*, 113 F. Supp. 2d at 601 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)). In the Second Circuit, a three-part test

is used to determine when a municipality's failure to train amounts to "deliberate indifference."

*Id.* at 601-02. In *Walker v. City of New York*, the court held:

> First, the plaintiff must show that a policymaker knows "to a moral certainty" that her employees will confront a given situation. . . . Thus, a policymaker does not exhibit deliberate indifference by failing to train employees for rare or unforeseen events. Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation. . . . [Third], the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.

974 F.2d 293, 297 (2d Cir. 1992).

Plaintiffs argue that District defendants consciously chose not to train the employees for the purposes of working with a child with special needs, when with "moral certainty," defendants and school staff would be in contact with students classified as multi-disabled on a daily basis.

" '[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 131 S. Ct. 1350, 1361 (2011) (quoting *Bd. of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 410 (1997)).

In the first instance, plaintiffs have not identified any "policymaker," much less one who knew to a "moral certainty" that the middle school staff would confront a situation like the one in the instant case. Second, having encountered the situation, the school appears to have handled it properly by seizing and restraining EC to prevent him from harming himself or anyone in his vicinity. Plaintiffs have not offered a superior procedure which the school should have followed and the alternative, i.e., letting EC run around the playground unmoderated, was unacceptable. Third, plaintiffs have failed to establish that EC suffered a deprivation of his constitutional rights

-44-

at the District defendants' hands, and thus, as a matter of law, they cannot show that a municipality's policy or procedure resulted in a constitutional violation.

Furthermore, "[a] single incident alleged in a complaint, especially if it involved only actors below the policymaking level, generally will not suffice to raise an inference of the existence of a custom or policy." *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993). Thus, for the reasons stated above and because plaintiffs have not produced evidence of additional incidents in the nature of the complained of conduct or demonstrated that Principal Stokkers was a "policymaker," District defendants' motion for summary judgment on plaintiffs' municipal liability claim is granted and the claim is dismissed against them.

### g. *Individual Liability of Stokkers and Zimmerman*

Although 42 U.S.C. § 1983 basically seeks "to deter *state* actors from using the badge of their authority to deprive individuals of their federally guaranteed rights," it may also impose liability upon a private individual. *Wyatt v. Cole*, 504 U.S. 158, 161-62 (1992). "In order for an individual to be liable under § 1983, the plaintiff must demonstrate that the defendant is personally involved in the alleged constitutional violation. Personal involvement can mean either (1) direct participation, (2) failure to remedy the wrong after learning of it, (3) creation of a policy or custom under which unconstitutional practices occurred, or (4) gross negligence in managing subordinates." *Dawson v. County of Westchester*, 351 F. Supp. 2d 176, 196 (S.D.N.Y. 2004) (citing *Zappala v. Albicelli*, 980 F. Supp. 635, 639-40 (N.D.N.Y. 1997)).

Plaintiffs allege that defendants Principal Stokkers and teacher's assistant Zimmerman are subject to individual liability under § 1983 because they were personally involved in the violation

of EC's constitutional rights. They contend that Stokkers' and Zimmerman's failure to prevent, mitigate or end the unlawful conduct imposed on EC warrants a finding of personal involvement.

After considering the facts of this case as well as the purported incidents of Stokkers' and Zimmerman's personal involvement, District defendants' motion for summary judgment on this claim must be granted. First, as plaintiffs point out, Stokkers and Zimmerman were "spectators" who did not directly participate in the actual seizure or restraint of EC by either physical means or by directing Burns and Wilson to do so. Furthermore, given the Court's finding that the seizure and restraint of EC was not only reasonable but necessary under these facts, plaintiffs cannot establish that these two defendants failed to right a wrong. Nor can plaintiffs establish that either defendant created a policy that is unconstitutional and nor do plaintiffs suggest that they can. Finally, there is no evidence that Stokkers grossly mismanaged her subordinates and Zimmerman had no subordinates for the purposes of this claim. Rather, it is clear from the record that EC had to be restrained for his own well being and for the well being of bystanders. As defendants point out, EC's Protocol for Intervention states: "Physical restraint or force SHOULD NOT be used on [EC] *unless* he becomes physically aggressive towards himself and/or others." Aff. Seid, Exh. W at ¶ 5 (emphasis added).

For these reasons, plaintiffs' 42 U.S.C. § 1983 individual liability claims against Stokkers and Zimmerman are dismissed and defendants' motion for summary judgment is granted on that claim.

### 2.    Plaintiffs' Americans with Disabilities Act Claim

Pursuant to 42 U.S.C. § 12132 ("ADA"), "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." Where a claim is brought pursuant to the ADA by a party covered under the IDEA, the claimant must exhaust his or her administrative remedies before commencing suit in federal court. *See Kielbus ex rel. Kielbus v. New York City Bd. of Educ.*, 140 F. Supp. 2d 284, 287 (E.D.N.Y. 2001) ("According to the plain language of the IDEA, plaintiff must first exhaust all administrative procedures required by the IDEA before filing in federal court. Even assuming plaintiff is able to circumvent filing under the IDEA and is allowed to bring his action under the ADA . . . the IDEA's exhaustion requirement also applies to suits brought pursuant to the ADA . . . .") (citing 20 U.S.C. § 1415(l); *Hope v. Cortines*, 872 F. Supp. 14, 21 (E.D.N.Y. 1995)).

District defendants argue that plaintiffs' ADA claim should be dismissed because plaintiffs failed to exhaust their administrative remedies and, therefore, this Court has no jurisdiction over the claim. Plaintiffs contend that the requirement is not inflexible and that a plaintiff need not exhaust his or her administrative remedies in cases where exhaustion would be futile. Plaintiffs also argue that the exhaustion requirements do not apply because defendants did not advise them of their procedural rights.

As plaintiffs note, "[while it is true that IDEA plaintiffs are generally required to exhaust their administrative remedies prior to seeking redress in federal court, this requirement is not inflexible." *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 149 (2d Cir. 2002). "Exhaustion will be excused where it would be futile [because] 'the agency has adopted a policy or practice of general applicability that is contrary to law, or it is improbable that adequate relief is available in the administrative forum . . . .' " *Id.* (quoting *Mason v. Schenectady City Sch. Dist.*, 879 F. Supp. 215, 218 (N.D.N.Y 1993)). Exhaustion requirements may also excused where

"parents have not been notified that such remedies were available to them." *Id.* (citing *J.G. v. Bd. of Educ.*, 830 F.2d 444, 447 (2d Cir. 1987)).

As District defendants point out, however, there is no evidence in the record of a district-wide policy or practice that violates the IDEA and/or forecloses relief through administrative remedies and nor do plaintiffs cite to any. As defendants also note, nothing in the IDEA's statutory requirements implicates a school district's obligation to advise a plaintiff of available remedies and administrative procedures for a student whose behavior left the school with no alternative but to seize and restrain him for his own protection and the protection of others.

Consequently, plaintiffs do not fall within the limited exceptions to the exhaustion requirement and were required to utilize administrative remedies before commencing suit in this Court. Accordingly, this Court does not have subject matter jurisdiction over their ADA claim and District defendants' motion for summary judgment on this claim is granted and the ADA claim is dismissed.

### 3.    Plaintiffs' New York State Claims

Pursuant to 28 U.S.C. 1367(c)(3), a district court "may decline to exercise supplemental jurisdiction" if "the district court has dismissed all claims over which it has original jurisdiction." District defendants' motion for summary judgment has been granted on all of plaintiffs' federal claims, and, therefore, the Court declines to exercise jurisdiction over plaintiff's New York State law intentional and negligent infliction of emotional distress claims because those claims prevail over those giving original federal jurisdiction. Thus, the state claims are hereby dismissed without prejudice. *See Karmel v. Claiborne, Inc.*, No. 99 Civ. 3608, 2002 WL 1561126, at *4 (S.D.N.Y. July 15, 2002) ("Where a court is reluctant to exercise supplemental jurisdiction because of one of

the reasons put forth by § 1367(c) or when the interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain matters of state law, it should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court.").

**4.    District Defendants' Motion for Summary Judgment is Granted**

For the foregoing reasons, District defendants' motion is granted with respect to plaintiffs' 42 U.S.C. § 1983 and American with Disabilities Act claims and the claims are dismissed with prejudice. Plaintiffs' New York State intentional and negligent infliction of emotional distress claims are dismissed without prejudice to renew.

**C.    County Defendants' Motion for Summary Judgment**

The remaining defendants, the County of Suffolk, Suffolk County Police Department and Police Officer Andrew Fiorillo ("County defendants), also move for summary judgment on plaintiffs' Amended Complaint.

As an initial matter, in support of their motion for summary judgment, County defendants rely on and adopt District defendants' arguments as to the following of plaintiffs' claims: American with Disabilities Act violation; Fifth and Fourteenth Amendment violations; abuse of governmental authority; corporal punishment; and infliction of emotional distress.

With respect to plaintiffs' ADA claim, the County defendants, adopting the District defendants' memoranda, argue that the ADA has its own right of enforcement and, consequently, an ADA action may not be brought pursuant to 42 U.S.C. § 1983. Dist. Def. Mem. in Supp. at p. 12. *See Patterson v. City of Oneida*, 375 F.3d 206, 255 (2d Cir. 2004) ("A § 1983 action may not, however, be brought to vindicate rights conferred only by a statute that contains its own structure

for private enforcement, such as Title VII."); *Brown v. Research Foundation of SUNY*, No. 08 Civ. 592, 2009 WL 1504745, at *10 (N.D.N.Y. May 28, 2009) ("Because Title VII, the ADA, and the ADEA contain their own structure for private enforcement, Plaintiff may not bring a § 1983 claim premised upon the substantive rights provided by these statutes."). Thus, plaintiffs' ADA claim against the County defendants may not be brought under § 1983 and County defendants' motion for summary judgment on that claim is granted and it is dismissed.

As to the other claims and in view of the District defendants' memoranda to the extent same was adopted by County defendants, their motion for summary judgment on the following claims is granted for the same reasons as the District defendants: (1) plaintiffs' Fifth and Fourteenth Amendment substantive Due Process and Equal Protection Clause claims; (2) corporal punishment claim; and (3) abuse of government authority claim. Plaintiffs' infliction of emotional distress claims as to the County defendants are dismissed without prejudice to renew. Plaintiffs' remaining claims are discussed below.

### 1. Plaintiffs' 42 U.S.C. § 1983 Claims Against the County Defendants

#### a. *Seizure and Restraint of EC by Defendant Fiorillo*

Having set forth the law pertinent to § 1983 and Fourth Amendment claims, *supra*, the Court turns to plaintiffs' unlawful seizure and restraint claim against the County. In support of their motion for summary judgment, County defendants argue that it was entirely reasonable for defendant Fiorillo to seize and handcuff EC given his violent attempts to harm school personnel, their inability to control him despite a prolonged effort, the threat he posed to other students and his attempt to cause injury to himself.

On the other hand, plaintiffs argue that Fiorillo purposely restrained EC to restrict his

movement and that EC was aware of and did not consent to being confined or handcuffed. Plaintiffs also argue that the County defendants acted in direct contradiction of EC's teacher's plea not to handcuff EC and in disregard of EC's Protocol for Intervention.

As discussed above, "seizures in the public school context [are] to be governed by the reasonableness standard giving special consideration to the goals and responsibilities of our public schools." *Shuman ex rel. Shertzer v. Penn Manor School Dist.*, 422 F.3d 141, 148 (3d Cir. 2005). Thus, a court must consider whether the seizure and restraint was " 'justified at its inception' " and " 'reasonably related in scope to the circumstances which justified the interference in the first place.' " *Mislin*, 2007 WL 952048, at *8 (quoting *Bisignano*, 113 F. Supp. 2d at 597).

The credible and undisputed testimony in this case shows that when Fiorillo arrived at the Huntington Intermediate School's parking lot, he saw Wilson and Burns struggling to restrain EC on the ground in the playground area with EC seated in close proximity to a railroad tie. Defendant Fiorillo observed EC kicking his feet, flailing his arms while yelling and trying to head butt and bite bystanders. Fiorillo and the guards tried to calm EC by talking to him. That failed and Wilson advised Fiorillo she could no longer hold EC so she transferred his wrist to Burns' hands. EC then tried to bite Burns and bent Burns' finger back. Fiorillo then restrained EC by himself while EC continued to scream, yell and kick despite Fiorillo's attempts to calm him. Approximately five to seven minutes after arriving at the scene on the playground, Fiorillo told Principal Stokkers that he could not control EC and would have to handcuff him. EC's mother RC was notified and she arrived at the scene approximately five minutes after EC was placed in the handcuffs. The handcuffs were removed as soon as RC asked Fiorillo to take them off of EC.

Given the foregoing and what was known to Fiorillo as he approached the scene on the

playground, it was reasonable for him to handcuff EC once Fiorillo was unable to control EC by himself. Furthermore, continued restraint of EC was also reasonable given the nature of the situation, EC's age, sex and the limited amount of time that EC was actually cuffed before his mother arrived, who apparently was able to calm him. Nor under these facts was there any reasonable alternative to Fiorillo's limited handcuffing of EC and plaintiffs do not suggest any such scenario. It is also noted that RC refused to allow EC to go to the hospital in the ambulance that was called and that EC, according to the evidence, briefly saw his own doctor who examined the results of EC's laboratory tests and told RC to bring EC home. For these reasons, the seizure and restraint by handcuffing of EC by Fiorillo was justified at its inception and reasonable in scope. Accordingly, County defendants' motion for summary judgment in plaintiffs' unreasonable seizure and false imprisonment claim is granted and the claim against them is dismissed.

### b.    Excessive Force Claim

"A claim that a law enforcement official used excessive force during the course of an arrest, investigatory stop, or other 'seizure' of the person is to be analyzed under the 'objective reasonableness' standard of the Fourth Amendment." *Vizzari v. Hernandez*, 766 N.Y.S.2d 883, 884 (N.Y. App. Div. 2003). Having already discussed the law with respect to excessive force claim analysis for seized individuals, *supra*, the Court briefly reiterates the factors to be considered, including " 'the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' " *Johnson v. Newburgh Enlarged School Dist.*, 239 F.3d 246,

251-52 (2d Cir. 2001) (quoting *Metzger*, 841 F.2d at 520).

On the current record, there is simply no evidence that defendant Fiorillo applied excessive force in handcuffing and restraining EC. First, Fiorillo avoided handcuffing EC until he was no longer able to restrain EC by himself. Secondly, the handcuffs were on for a relatively minimal amount of time and were removed immediately upon RC's request, which coincided with her arrival at the playground and EC's gain of control over his emotions. Next, plaintiffs themselves admitted that defendant Fiorillo did not punch, kick or cause any fractures to EC. They also admit that Fiorillo did not use any force against EC other than handcuffing and restraining him. Finally, plaintiffs admit that EC did not receive medical treatment for a physical injury which was the immediate result of physical contact with Fiorillo or from being handcuffed.

In light of the foregoing, any force used by Fiorillo in seizing and restraining EC was objectively reasonable and, consequently, not excessive as a matter of law. Therefore, County defendants' motion for summary judgment on plaintiffs' excessive force claim is granted and the claim is dismissed.

### c. *Municipal Liability*

Plaintiffs contend that the County of Suffolk is liable for failing to train its employees because Fiorillo, a school resource officer within a district that knowingly maintained a special education program, received no training with regard to special education students on any level.

Having determined, however, that Fiorillo did not violate EC's rights, it may not be said that his conduct was the result of the County's deliberate indifference or of a policy or custom espoused by the policymakers. Accordingly, County defendants' motion for summary judgment

on plaintiffs' municipal liability claim is granted and the claim is dismissed as against the County defendants.

### 2. Plaintiffs' New York State Law Claims

For the reasons set forth above, plaintiffs' New York State infliction of emotional distress claims against the County defendants are hereby dismissed without prejudice to renew.

### 3. County Defendants' Motion for Summary Judgment

For all of the foregoing reasons, the County defendants' motion for summary judgment on plaintiffs' federal claims is hereby granted.

## III. CONCLUSION

For all of the foregoing reasons, the District and County Defendants' motions for summary judgment on plaintiffs' Amended Complaint are hereby **GRANTED** and the Amended Complaint is dismissed in its entirety. Plaintiffs' New York State law claims are hereby dismissed without prejudice.

**SO ORDERED.**

Dated: March 30, 2012
      Central Islip, New York

_____/s/_____
Thomas C. Platt, U.S.D.J.
